FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2009 DEC 31   AM 11: 04

LORETTA G. WHYTE
CLERK



## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| MICHAEL MICELI | * | CIVIL ACTION |
| | * | NUMBER: **09 - 8078** |
| VERSUS | * | SECTION: **SECT. A MAG. 2** |
| SHERIFF MARLIN GUSMAN, DR. SAMUEL GORE, DR. MICHAEL HIGGINS, MARY ANNE BENITEZ, DR. MARCUS DILEO, | * | JUDGE:<br><br>MAGISTRATE: |
| L. POLK (RN), DAVID OATES (RN), DEBNI HAMMOND (LPN), SHIRLEY PETITE (LPN), SHAWN VIVERETTE (LPN), DWAYNE TOWNZEL (LPN), | * | CIVIL RIGHTS |
| DEPUTY JAVONDA LENNOX, DEPUTY TYRONE WILLIAMS, DEPUTY J. CONNOR, DEPUTY CYNTHIA DONALD, DEPUTY | * | UNDER 42 USC 1983 and 1988 |
| BLACK, DEPUTY LAWSON, CAPTAIN CARLOS LOCQUE, MAJOR JENKINS, DEPUTY JOHN/JANE DOES and MEDICAL JOHN/JANE DOES | * | JURY TRIAL |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## **COMPLAINT**

1

Fee 350
Process
Dktd
CtRmDep
Doc. No.

## I.   **INTRODUCTION**

This case involves the tragic death of Cayne Miceli, a forty-three year old New Orleans woman, with a history of asthma, panic attacks and depression, who died as a result of being tied down in five-point restraints for over 4 hours on Jan 4-5, 2009, on the tenth floor, "mental health unit" of the House of Detention (HOD) a facility which is part of the Orleans Parish Prison (OPP) complex which is operated and supervised by the Orleans Parish Criminal Sheriff's Office (OPCSO).

Ms. Miceli was in the custody of the OPCSO on municipal charges related to an alleged altercation at Tulane Medical Center (Tulane) related to her efforts to obtain necessary medical care for an acute asthma attack on Jan. 4, 2009.  Upon arrival at the jail, Ms. Miceli was not properly diagnosed or treated. After Ms. Miceli was denied adequate medical care at the jail, she attempted suicide. In response, the defendants, despite the obvious risk of serious harm, tied Ms. Miceli down, flat on her back, in 5 point restraints, without adequate supervision or medical treatment or intervention. The restraints further compromised Ms. Miceli's ability to breathe. When Ms. Miceli struggled to remove the restraints so that she could breathe, defendant deputies physically held her down, resulting in her death. The use of five-point restraints on a person in Ms. Miceli's condition was beneath the standard of care. In addition, the restraints were used inappropriately as punishment, not treatment.

The Orleans Parish Prison has inadequate medical screening, inadequate staffing, inadequate training and supervision of staff and inadequate policies and

2

procedures relating to diagnosis and treatment of persons in Ms. Miceli's condition, which inadequacies are directly related to Ms. Miceli's death. There have been numerous other similar, avoidable, unnecessary and unconscionable injuries, suffering and deaths of prisoners related to the use of so-called therapeutic restraints and denial of adequate medical care at the jail for many years.  The instant case represents yet another instance of a shocking degree of callous and inexcusable disregard for the serious medical needs of a prisoner at OPP, in this instance, Ms. Miceli, by those persons who were responsible for her care.

## II.  JURISDICTION

1.    This action is brought pursuant to 42 U.S.C. 1983 and 1988 and pursuant to the First, Fourth and Fourteenth Amendments of the United States Constitution. Jurisdiction is founded on 28 U.S.C. Sections 1331 and 1343 and the aforementioned statutory and constitutional provisions. Plaintiff further invokes the pendant jurisdiction of this Court to consider claims arising under state law pursuant to 28 USC Section 1367.  A jury trial is requested.

## III. PARTY PLAINTIFF

2.    Michael Miceli is the father of Cayne Miceli, who died while under the custody and care of the defendants as further described herein. Michael Miceli is a person of the full age of majority, who resides in the Southern District of Alabama. His daughter, Cayne Miceli, was unmarried at the time of her death and had no children.

## IV. PARTY DEFENDANTS

3

3.      Defendant Sheriff Marlin Gusman was Criminal Sheriff of Orleans Parish at all times described herein, and, as such, is responsible for the hiring, training, supervision, discipline and control of the deputies under his command, as well as medical personnel.  He is also responsible for the supervision, administration, policies, practices, customs and operations of the OPCSO and its correctional facilities.  He is a final policymaker. He is liable both directly and vicariously for the actions complained of herein.  He is sued in his individual and in his official capacity for those acts and omissions, which occurred while he was Criminal Sheriff.  He is a person of the full age of majority and, on information and belief, a resident of the Eastern District of Louisiana.

4.      Defendant Dr. Samuel Gore is the Medical Director of the Orleans Parish Criminal Sheriff's Office and is an employee of the OPCSO. At all pertinent times herein, he was responsible for the provision of medical care and health care services for persons incarcerated in OPCSO facilities, both directly and as a supervisor. He was responsible for recommending and hiring qualified health care professionals and staff, insuring adequate staffing for the medical needs of prisoners, for the supervision, training, discipline and oversight of personnel and provision of medical services at OPCSO correctional facilities and was responsible to insure access and provision of reasonable and adequate health care for persons in custody at the jail. He is responsible for supervising the development and revision of policies, procedures, and protocols concerning the delivery of medical and mental health services at the jail. He is also responsible for monitoring compliance with all health services policies and

4

procedures and protocols. He negotiates and monitors contracts with outside agencies involved in providing health care services to persons in custody of the OPCSO. All matters of medical and mental health judgment are the sole province of the Medical Director. He is a final policymaker with regard to the provision of medical and psychiatric services to persons in the custody of the OPCSO. He was responsible for the direction, supervision and discipline of the medical/psychiatric defendants named herein as well as medical/security co-ordination and training and supervision of correctional employees in health-related matters. In addition, at all relevant times herein, Dr. Gore was acting as Director of Nursing as the OPCSO did not staff a Director of Nursing position. On information and belief, he shared this position with defendant Mary Anne Benitez.. As one of two acting directors of nursing, Dr. Gore was responsible for hiring, training, supervision, discipline and co-ordination of nursing services, including co-ordinating physician/nursing sick call and follow-up care, staffing and implementation of appropriate nursing standards and procedures. He was responsible for insuring that appropriate and adequate nursing care was given to persons at risk for suicide and those in restraints on HOD-10, the Acute Psychiatric Unit in the jail. He is sued in his individual and official capacity. He is a person of full age of majority and, on information and belief, is a resident of the Eastern District of Louisiana.

5.      Defendant Dr. Michael Higgins is the Mental Health Director for OPP and is an employee of the OPCSO. At all pertinent times herein, he was responsible for the provision of psychiatric services for person incarcerated in OPCSO facilities, both

directly and as a supervisor.  He was responsible for recommending and hiring qualified

mental health care professionals and staff, insuring adequate staffing for the medical

needs of prisoners, for the supervision, training, discipline and oversight of personnel

and provision of medical services at OPCSO correctional facilities and was responsible

to insure access and provision of reasonable and adequate health care for persons in

custody at the jail. He is responsible for supervising the development and revision of

policies, procedures, and protocols concerning the delivery of mental health services at

the jail.  He is also responsible for monitoring compliance with all health services

policies and procedures and protocols. He negotiates and monitors contracts with

outside agencies involved in providing health care services to persons in custody of the

OPCSO.  All matters of mental health judgment are the sole province of the Mental

Health Director. He is a final policymaker with regard to the provision of medical and

psychiatric services to persons in the custody of the OPCSO. He was responsible for

the direction, supervision and discipline of the medical/psychiatric defendants named

herein as well as medical/security co-ordination and training and supervision of

correctional employees in health-related matters.  He is sued in his individual and official

capacity.  He is a person of full age and majority and, on information and belief, is a

resident of the Eastern District of Louisiana.

      6.     Defendant Mary Anne Benitez was the Health Services Administrator for

the OPCSO, at all pertinent times herein, and was responsible for supervising daily

administrative operations within the department including monitoring and reporting on

the use of restraints. She was also responsible for oversight, training and supervision of medical employees and health care training for correctional officers, as well as coordination between medical and security personnel. She was responsible for insuring the provision and adequacy of care and safety of Cayne Miceli at the time of Ms. Miceli's incarceration and death. In addition, on information and belief, she was one of two acting directors of nursing during all pertinent times, and as such was responsible for hiring, training, supervision, discipline and co-ordination of nursing services, including co-ordinating physician/nursing sick call and follow-up care, staffing and implementation of appropriate nursing standards and procedures. She was responsible for insuring that appropriate and adequate nursing care was given to persons at risk for suicide and those in restraints on HOD-10, the Acute Psychiatric Unit in the jail. She is sued in her individual and official capacity. She is a person of the full age of majority and, on information and belief, is a resident of the Eastern District of Louisiana.

7.    Defendant Dr. Marcus Dileo is a medical doctor employed by OPCSO, who provided medical services to Cayne Miceli. At all pertinent times herein he was responsible for providing appropriate and adequate medical care to persons in custody of the OPCSO, including Cayne Miceli. He authorized medical care and treatment for Cayne Miceli as described herein. He had supervisory responsibilities over other medical staff as well as correctional officers and medically trained personnel who had responsibilities related to patient care. He is sued in his individual and official capacity. He is a person of the full age of majority and, on information and belief, is a resident of

7

the Eastern District of Louisiana.

8.     Defendant L. Polk was an employee of the OPCSO in the position of

Registered Nurse (RN) and at all pertinent times herein, was responsible for providing

reasonable and adequate medical care to persons held in the custody of the OPCSO

and in particular, in medical screening, evaluation and care of individuals as they were

booked into the jail. She was directly involved in the screening, evaluation and care of

Cayne Miceli as described herein. She had supervisory responsibilities regarding other

medical personnel employed by OPCSO, including Licensed Practical Nurses (LPN)

and Medical Assistants (MA).  She is sued in her individual and official capacity.  She is

a person of the full age of majority and, on information and belief, is a resident of the

Eastern District of Louisiana.

9.     Defendant David Oates was an employee of the OPCSO in the position of

Registered Nurse (RN) and at all pertinent times herein, was responsible for providing

appropriate and adequate medical care to persons held in the custody of the OPCSO

and in particular South White Street and on HOD - 10. He had direct involvement in the

evaluation and care of Cayne Miceli as described herein. He had supervisory

responsibilities regarding other medical personnel employed by OPCSO, including

Licensed Practical Nurses (LPN) and Medical Assistants (MA).  He is sued in his

individual and official capacity.  He is a person of the full age of majority and, on

information and belief, is a resident of the Eastern District of Louisiana.

8

10.    Defendants Shirley Petite, Debni Hammond, Dwayne Townzel, and Shawn Viverette were each employees of the OPCSO, licensed and employed as LPNs, at all pertinent times herein, and were responsible for providing appropriate and adequate nursing care, including documentation and paperwork necessary for continuity of care of persons in the custody of the OPCSO, including assessing and monitoring the medical and psychiatric condition, health and safety of Cayne Miceli and providing appropriate and adequate nursing care and assessments for her, with proper documentation of same.  Defendants Petite, Hammond, Townzel and Viverette had the authority and responsibility to make regular and periodic checks relative to Cayne Miceli's physical and mental status, including the duty to insure that she was in a safe environment and that she was not held in restraints beyond what was medically necessary and as authorized.  These defendants are sued in their individual and official capacities.  These defendants are persons of the full age of majority, and on information and belief, are residents of the Eastern District of Louisiana.

11.    Defendants Deputies Black and Lawson are employed by the OPCSO as correctional officers.  At all pertinent times herein they were responsible for communicating reported or obvious medical needs of prisoners, including Cayne Miceli, to medical staff.  They were responsible for checking on and supervising the condition of Cayne Miceli while she was on lockdown at South White Street as described herein. They are sued in their official and individual capacities.  They are of full age of majority and, on information and belief, they are residents of the Eastern District of Louisiana.

9

12.    Defendant Captain Carlos Locque is employed by the OPCSO as a correctional officer and was a supervisor, assigned to HOD-10 of the Orleans Parish jail. At all pertinent times herein he was responsible for communicating reported or obvious medical needs of prisoners, including Cayne Miceli, to medical staff and of properly supervising, training and overseeing the proper job performance of OPCSO employees under his supervision.  He was responsible for checking on and supervising the condition of Cayne Miceli while Ms. Miceli was in restraints and for insuring that Ms. Miceli was in a safe environment.  He was also responsible for insuring that proper documentation for the restraint and observation of Ms. Miceli was performed, as well as being responsible for the supervision and training of defendants Lennox, Donald, J. Connor and Williams and other deputies assigned to duties on HOD-10. He is a person of the full age of majority and, on information and belief, is a resident of the Eastern District of Louisiana. He is sued in his official and individual capacity.

13.    Defendants Deputies Cynthia Donald, Javonda Lennox, J. Connor and Tyronne Williams at all pertinent times herein, were employed by the OPCSO as correctional officers, assigned to the HOD-10 of the Orleans Parish jail.  They were responsible for communicating reported or obvious medical needs of prisoners, including Cayne Miceli, to medical staff.  They were also responsible for conducting and accurately reporting regular, periodic observations of Cayne Miceli during the time she was in restraints in HOD-10, proper checking and documentation of orders related to Ms. Miceli's restraint and for insuring that she was in a safe environment and received

10

adequate care.  They are sued in their individual and official capacity.  They are of full

age of majority and, on information and belief, they are residents of the Eastern District

of Louisiana.

14.    Defendant Major Jenkins was employed by the OPCSO as Warden of

HOD-10, where Cayne Miceli was held, and at all pertinent times was responsible for

training, supervising, monitoring and disciplining OPCSO deputies, including those

named as defendants herein, overseeing the security and well-being of persons held on

HOD-10. He was also responsible for co-ordination between security officers and

medical personnel regarding prisoners in need of medical care, including Cayne Miceli.

He is sued in his individual and official capacity.  He is a person of the full age of

majority and, on information and belief, he is a resident of the Eastern District of

Louisiana.

15.    Defendants Deputy John/Jane Does were employed by the OPCSO as

correctional officers, at all pertinent times herein, and were assigned to the HOD-10 of

the Orleans Parish jail.  They were responsible for communicating reported or obvious

medical needs of prisoners, including Cayne Miceli, to medical staff.  They were also

responsible for conducting and accurately reporting regular, periodic observations of

Cayne Miceli during the time she was in restraints in HOD-10, proper checking and

documentation of orders related to Ms. Miceli's restraint and for insuring that she was in

a safe environment and received adequate care.  While their identities are currently

unknown to plaintiff, they are aware of their conduct and actions with regard to the

11

events surrounding Ms. Miceli's incarceration at the jail. They are sued in their individual and official capacity.  They are of full age of majority and, on information and belief, they are residents of the Eastern District of Louisiana.

16.     Defendants Medical John/Jane Does were employed by the OPCSO as medical professionals, at all pertinent times herein, and were responsible for providing appropriate and adequate medical care, including documentation and paperwork necessary for continuity of care of persons in the custody of the OPCSO, including assessing and monitoring the medical and psychiatric condition, health and safety of Cayne Miceli and providing appropriate and adequate medical and nursing care and assessments for her, with proper documentation of same. While their identities are currently unknown to plaintiff, they are aware of their conduct and actions with regard to the events surrounding the incarceration of Ms. Miceli at the jail. They are sued in their individual and official capacity.  They are of full age of majority and, on information and belief, they are residents of the Eastern District of Louisiana.

## V. <u>STATEMENT OF FACTS</u>

17.     On Sunday, January 4, 2009, Cayne Miceli, a 43 year old female resident of New Orleans, Louisiana, was experiencing difficulty breathing.  Ms. Miceli has a history of chronic asthma and is subject to acute asthma attacks.  Ms. Miceli arrived at the emergency room (ER) at Tulane Medical Center in New Orleans, La., at 7:05 am seeking medical treatment for a severe asthma attack.

12

18.    Ms. Miceli remained in the Tulane ER for approximately 7 hours. Her chief complaint was asthma and she had audible wheezing. She was noted to have "labored breathing." She was initially treated with a face mask. Ms. Miceli continued to have difficulty breathing, so the ER nurses started a nebulizer treatment of albuterol and started an I.V. of Solu-Medrol. Both Solu-Medrol and Albuterol are steroids. The nebulizer is a method of administering medications that have been dissolved in a liquid then aerosolized.

19.    Ms. Miceli continued to have difficulty breathing after the first nebulizer treatment, so she was given a second treatment, again using albuterol. Ms. Miceli continued to have audible wheezing and difficulty breathing, so she was given a third nebulizer treatment using albuterol. The Tulane ER physician noted that if Ms. Miceli was not improved after the third nebulizer treatment, she would need to be admitted to the hospital for in-patient care.

20.    The medications given to Ms. Miceli, while potentially life-saving in an acute asthma attack situation, can create or exacerbate an agitated and excited state in patients. Such a response is not uncommon and requires monitoring and a treatment regimen of a gradual tapering off of the medication.

21.    At approximately 2:10pm, despite her continued discomfort, the Tulane ER physician began discussing discharging Ms. Miceli from the ER. The Tulane ER discharge plan for Ms. Miceli included a prednisone taper and refills of the nebulizer medications. Ms. Miceli became upset and protested that she was still in need of

13

medical care and that she was being discharged from Tulane Medical Center, a private hospital, because she did not have health insurance. Ms. Miceli insisted upon speaking with a patient advocate to express her opposition to the plan to discharge her.

22.    Ms. Miceli was clearly in an agitated state, which was a marked change from her previous reported affect. It was also apparent that she continued to have difficulty breathing and was unstable, however Tulane ER personnel did not re-admit Ms. Miceli to the ER, did not admit her to the hospital and did not arrange for a psychiatric or mental health consultation, evaluation or intervention.  Instead, the Tulane University Police Department (TUPD) had Ms. Miceli arrested for the municipal charges of disturbing the peace, resisting arrest and battery on an officer for allegedly biting a TUPD officer who was attempting to remove her from the premises against her will.

23.    The New Orleans Police Department (NOPD)  transported Ms. Miceli to the Orleans Parish Prison, (hereafter OPP) which is under the jurisdiction, supervision and operation of the defendant Orleans Parish Criminal Sheriff Marlin Gusman.  Ms. Miceli was arrested at the Tulane ER at 2:45 pm and arrived at OPP at 3:36pm. Her booking sheet reflects that she was booked into OPP at 4:25pm.

24.    When she arrived at OPP Ms. Miceli was still wheezing and suffering the effects of the asthma attack.  When Ms. Miceli was booked into the jail, defendant L. Polk, RN, (hereafter defendant Nurse Polk) administered OPCSO's medical intake screening questionnaire.  Defendant Polk failed to adequately assess, evaluate or document Ms. Miceli's serious medical conditions, failed to provide adequate medical

14

care or treatment for her, failed to adequately or properly record or report her condition, or to properly alert other medical and correctional personnel so as to insure that Ms. Miceli would receive adequate medical care for her serious medical needs.

25.    The medical intake screening questionnaire has two sections, one for visual observations by medical intake screening personnel and the other involving "questions for all inmates". The intake form specifically requires the intake screener to note any obvious needle marks on the arrested subject. Defendant Nurse Polk failed to note that Ms. Miceli had needle marks as a result of the I.V. treatment she had just received at the Tulane ER.

26.    In response to the question, "Is the inmate able to answer?" Defendant Nurse Polk marked "N" for "No".  In the follow-up section to be completed regarding the reason why an inmate is not able to answer, defendant Nurse Polk marked "N" next to "refused", but marked "Y" ("Yes") next to "uncooperative".  All subsequent questions are marked as "R" indicating that Ms. Miceli refused to answer the questions. However, it is apparent that defendant Nurse Polk was provided with the discharge papers from the Tulane ER, as in the Comment field, the intake form notes that Ms. Miceli was seen at Tulane Hospital and had paperwork stating: "use nebulizer regularly x ? DYS, prednisone taper as prescribed.  Robitussin AM for cough."

27.    According to OPP medical records, while still in the booking process, Defendant Nurse Polk contacted defendant Dr. Dileo who authorized a Nebulizer-Albuterol treatment for Ms. Miceli at 1611 (4:11 pm), which was recorded as given at

15

1611 (4:16 pm) and a Prednisone taper administered at approximately the same time.
However, there is no record that any physician or other appropriately trained medical
personnel conducted a physical examination of Ms. Miceli at any time during the
booking process or while she was being admitted to the jail, to determine whether she
was medically appropriate for admission to the jail in her condition. On information and
belief, no assessment was made to determine whether her condition required
hospitalization  or whether she should be assigned to any infirmary or medical unit
within the jail for treatment and/or observation. Instead, defendant Nurse Polk and
defendant Dr. Dileo referred Ms. Miceli to be seen by a physician at MD sick call in 10
days.

      28.    In the intake form, defendant Nurse Polk also commented that Ms. Miceli
was "crying, yelling. States has panic attacks..." Despite this information, defendant
Nurse Polk failed to take appropriate steps to properly screen, evaluate or refer Ms.
Miceli for psychiatric evaluation, diagnosis or treatment. Defendant Nurse Polk failed to
properly review Ms. Miceli's previous intake questionnaire from a prior admit to the jail in
2007, which contained critically important medical information, such as drug allergies
(allergic to sulfa), that Ms. Miceli had a history of asthma and was taking "medications
for mental illness or bad nerves", i.e., Lexapro 1 pill QD.  Defendant Nurse Polk was
aware, must have been aware or should have been aware, that Ms. Miceli was
psychologically fragile, required psychiatric evaluation and intervention, yet failed to take
appropriate steps to insure that would occur.

16

29.    Despite Ms. Miceli's medical condition, obvious psychiatric distress and her medical and psychiatric history, defendant Nurse Polk referred Ms. Miceli for housing in "general population"  Furthermore, defendant Nurse Polk failed to refer Ms. Miceli immediately to a physician for a health and physical exam and also failed to contact or refer Ms. Miceli for a psychiatric evaluation for disposition.  Defendant Nurse Polk also failed to refer Ms. Miceli for follow-up care for MD, Psychiatric or Nurse sick call as per the intake form or to take appropriate and necessary steps to insure that Ms. Miceli received her prescribed medications from Tulane as ordered.

30.    Defendants Nurse Polk and Dr. Dileo knew, should have known, or must have known, that Ms. Miceli was at high risk of harm due to her medical condition and that the jail lacked adequate and appropriately trained staff to properly tend to Ms. Miceli's medical needs, yet failed to take necessary and appropriate steps to insure that she was either referred to a hospital for treatment or, if to be admitted to the jail, that she was adequately examined and treated at the jail.

31.    Ms. Miceli was booked into OPP at 4:25 pm and taken to the women's facility located on South White Street. At approximately 8:45pm, defendant David Oates, RN, prepared S.O.A.P. nurses notes indicating that Ms. Miceli had complained of having an asthma attack.  Defendant Nurse Oates saw Ms. Miceli at the South White Street facility. He documented that her pulse was 88 and her blood oxygen level (SP02) was 99%.  These readings are inadequate to properly determine whether or not an individual is experiencing an asthma attack, even if combined with listening to the lungs.

17

Despite Ms. Miceli's history of asthma and her documented treatment that same day at the Tulane ER for asthma, defendant Nurse Oates failed to conduct a PEAK flow test or to measure Ms. Miceli's $CO_2$ levels. Defendant Nurse Oates was aware that Ms. Miceli had been administered asthma medications during initial screening and triage at the jail, approximately 4 hours earlier. He knew, should have known or must have known of the serious risk of harm of asthma and that persons with asthma can be subject to repeated acute attacks, even after receiving treatment, which can be life-threatening. However, there is no indication in defendant Nurse Oates' SOAP notes that he reviewed Ms. Miceli's medical records at the jail or the discharge orders from the Tulane ER. There is also no indication that he provided her with any medications or treatment as ordered or made any effort to obtain any treatment or referral for her.

32.    The examination conducted by defendant Nurse Oates was inadequate and was not consistent with the community standard of care for an asthma patient such as Ms. Miceli. Ms. Miceli became upset when defendant Nurse Oates would not provide any treatment to her despite her complaints of difficulty in breathing. Instead, defendant Nurse Oates noted in his SOAP notes that he was informed by deputies that Ms. Miceli "had been a behavioral problem since arriving" at the South White Street location. Despite Ms. Miceli's obvious distress, defendant Nurse Oates failed to provide her with adequate and appropriate medical care and failed to refer her to a physician or a psychiatrist. He also failed to make any appropriate or necessary evaluation to determine whether she was possibly suffering from a panic attack or whether one was

18

imminent or to obtain treatment for her relative to that condition. He also failed to make

any appropriate or necessary evaluation to determine whether the medication given to

Ms. Miceli for her asthma condition was causing or exacerbating her agitated state.

33.    After Ms. Miceli was denied any treatment or referral for treatment by

defendant Nurse Oates, she was returned to dorm 2 of South White Street.

Approximately half an hour later, at 9:19pm, deputies called for back up because Ms.

Miceli was allegedly behaving in a hostile and belligerent manner. OPCSO security

staff, including defendant Deputies Black and Lawson, failed to notify medical staff or

take appropriate measures to obtain medical or psychiatric treatment for Ms. Miceli or to

document the content of Ms. Miceli's alleged behavior. Instead, OPCSO staff, including

defendant deputies Black and Lawson, transferred Ms. Miceli to lockdown in dorm cell

nine at approximately 9:30 pm.

34.    Defendant deputies Black and Lawson knew, should have known or must

have known, that Ms. Miceli was in need of medical intervention and was in a mentally

fragile and potentially dangerous state of mind, yet they failed to take any action to

obtain appropriate care for her.  Ms. Miceli was left in the lockdown cell without any

supervision despite her excited and distressed mental state, her reports of difficulty

breathing, the absence of any medical treatment for her condition, and her medical and

psychiatric history. The cell Ms. Miceli was placed in was not a "safe cell" , was not

situated for constant observation by deputies and had numerous tie-off points and

protrusions which could facilitate self-harm by an emotionally distressed occupant. On

information and belief, the actions of defendants Deputies Black and Lawson were authorized, condoned and/or ratified by their supervisors, who were also employees of the OPCSO.

35.    Ten minutes after the transfer to the lock down cell, at approximately 9:40pm, another inmate reported to deputies that Ms. Miceli was attempting to hang herself using her jail-issued jumpsuit tied around a speaker box.  Defendant deputy Johnson entered the cell, notified the medical department and requested a transport to the House of Detention (HOD.)  Ms. Miceli was taken to HOD where she was seen again by defendant Nurse David Oates.

36.    Defendant Nurse Oates completed a S.O.A.P. nurse notes form at 21:45 pm (9:45 pm) , in which it was noted that Ms. Miceli had been brought to the HOD clinic for a suicide attempt. He notes that she arrived at HOD, "crying and upset" and admitted that "I tried to hang myself."  Nurse Oates noted that Ms. Miceli appeared "anxious but cooperative with staff and giving information."

37.    Defendant Nurse Oates filled out the "Initial Evaluation of Suicidal Inmates" form.  In the evaluation, Nurse Oates answers "yes" to the question, "does the inmate have a plan?". In response to the question "Why does the inmate want to commit suicide now", Nurse Oates fails to provide any information as to "why" and merely writes "yes". Nurse Oates records that Ms. Miceli had previously attempted suicide in 1986 by overdose and describes her psychiatric conditions by checking off "Depression" and writing in "PTSD". Nurse Oates notes that Ms. Miceli had been under the care of a

20

psychiatrist before being admitted to OPP and that she had last seen her psychiatrist on

Dec. 17, 2008, a little over 2 weeks earlier. He also noted that she had not been seen

by Dr. Higgins, the OPCSO psychiatrist. It was noted that she was not in withdrawal

from drugs or alcohol and was not psychotic or hallucinating.

38.    In describing Ms. Miceli's mental status, defendant Nurse Oates noted

that Ms. Miceli was oriented as to person, place and day. Her general appearance was

described as "anxious" as was her affect. The description of Ms. Miceli's speech pattern

was "pressured". There is no description of her thought process and no indication of

delusions. The form offers three options for descriptions of behavior: normal, belligerent

and bizarre. "Belligerent" is circled for Ms. Miceli's behavior. There are no tremors,

diaphoresis or hallucinations, though she is "anxious appearing". Other than taking vital

signs, there is no physical examination or assessment of Ms. Miceli performed by

defendant Oates.

39.    At 9:45 pm defendant Nurse Oates contacted defendant Dr. Dileo by

phone.  Dr. Dileo ordered that Ms. Miceli be placed in 5 point restraints for her safety,

secondary to suicidal behaviors. There is no indication that Dr. Dileo or any other

physician or psychiatrist conducted any physical or mental examination or evaluation of

Ms. Miceli or ordered that such an examination and evaluation be conducted before Ms.

Miceli was to be placed in the restraints. Dr. Dileo's order stated that Ms. Miceli could be

restrained no longer than 9 hours before the restraints were to be removed or renewed.

It also provided that she may be released from restraints before 9 hours if her behavior

21

ceased or with MD Order. There is no indication that any less restrictive treatment

alternatives were considered for Ms. Miceli. The pre-printed order form states "No other

less restrictive treatment is appropriate", without explanation or any particularities

regarding Ms. Miceli's condition. The restraint order makes no mention of Ms. Miceli's

history of asthma or her recent acute asthma attack or the necessity of any precautions

or concerns related to same. There are no provisions made to insure that Ms. Miceli has

access to medication or treatment for her asthma condition while in restraints.

40.     Five point restraints at HOD involves placing an individual flat on their

back, in a single occupancy cell, on a metal bed attached to one side of the wall and

essentially tying them down with restraints on each arm and each leg (four points) with

a fifth restraining belt across the torso or chest area. With four point restraints the

individual is able to sit up, stand up and move around the cell. Five point restraints is a

total restriction of movement and is the most restrictive, most confining restraint

available at OPP.

41.     Defendants Nurse Oates and Dr. DiLeo knew, should have known, or

must have known of Ms. Miceli's asthma condition and her recent treatment for an acute

asthma crisis. They each knew, should have known or must have known of the serious

risk of harm involved in placing an individual with Ms. Miceli's condition and history in

five-point restraints, especially for such an extended period of time and especially given

staffing and training problems at OPP and previous incidents and complaints involving

injuries, suffering and death of inmates related to the use of restraints at OPP. Despite

her condition, her history and the obvious acute crisis, mental and physical, which Ms.

Miceli was experiencing, she was not evaluated or seen by any medical doctor or

psychiatrist before being placed in 5 point restraints under orders which provided for her

to remain in those restraints for up to 9 hours duration.

42.     On information and belief, Ms. Miceli was never seen, evaluated or

assessed, face-to-face, by a physician or a psychiatrist during the entire time she was in

custody or while in restraints, to determine her medical condition, the appropriateness of

the use or continuation of restraints, the appropriateness of her confinement in the cell

at HOD-10 or the appropriate level of observation and restraint warranted by her mental

and physical condition. Additionally, on information and belief, at no time were there any

efforts made to determine whether any less restrictive alternatives would be sufficient to

protect her from self-harm, other than the five point restraints, and no efforts were made

at any time to determine whether she was able to contract for safety and be released

from the restraints.

43.     While in custody at OPP, Ms. Miceli never received any treatment or

medication for her panic attacks or her mental state. Other than the initial treatment at

4:16 p.m. in the intake and booking area, she never received any treatment for her

serious asthma condition. The treatment given to Ms. Miceli by defendants was

seriously deficient and was beneath the community standard of care for a patient in Ms.

Miceli's condition, with her history.

44.     Defendant Nurse Oates notified defendant LPN S. Petite of Ms. Miceli's

admission to HOD -10 and the five-point restraint order.  Defendant LPN D.Hammond

conducted a Psychiatric Nursing/MA Evaluation of Ms. Miceli at 2215 (10:15pm) upon

her arrival on HOD-10.  Nurse Hammond was aware of Ms. Miceli's medical history of

"asthma" and "depression". She was aware that Ms. Miceli was prescribed medication

for her asthma condition that same day. She was also aware of the 2007 admit where

Ms. Miceli was on lexapro and noted her allergy to sulfa.

      45.     There is no indication that defendant LPN Hammond provided Ms. Miceli

with any medication prior to authorizing her placement in restraints or at any time while

Ms. Miceli was in restraints. There is no indication that Ms. Miceli had an inhaler with

her to use as needed. Defendant LPN Hammond noted that Ms. Miceli "had 8

Prednisone pills in her possession" and took them away from her ("Meds taken away.")

Defendant LPN Hammond put a question mark "?" in her evaluation, as to whether Ms.

Miceli had received the two puffs of Albuterol on 1/4/09 and questioned whether Ms.

Miceli had received Advair (another medication for asthma) or Efflexor. There is no

indication that defendant LPN Hammond took any steps to make further inquiry about

whether Ms. Miceli was properly given her medications or to take any steps to insure

that she receive her medications as prescribed. Vital signs were taken (blood

pressure/temperature/HR/RR) and defendant LPN Hammond reported "no resp.distress

noted.  Ambulatory. Able to speak in clear sentences. Lungs clear to auscultation. Skin

W/D to touch". Yet no PEAK flow test or other measurements were taken of Ms. Miceli's

$CO_2$ levels and no further inquiry was made as to the obvious risk of serious harm to

24

Ms. Miceli, given her medical condition, of placing her in 5-point restraints for 9 hours.

46.    In her evaluation of Ms. Miceli, defendant LPN Hammond noted that Ms. Miceli was oriented, appeared "anxious" and that her behavior/attitude was "belligerent." Ms. Miceli's mood/affect was noted as "crying" and her speech pattern "pressured". Her thought processes were noted as "clear". There is no information noted as to Ms. Miceli's judgment/insight. There is also no indication of any effort to determine whether less restrictive alternatives than 5 point restraints were appropriate or whether Ms. Miceli could contract for safety in lieu of restraints.

47.    Defendant LPN Hammond was aware Ms. Miceli was placed in 5 point restraints and that this involved Ms. Miceli being restrained while lying flat on her back. She noted that a deputy was "sitting in front of cell for suicide watch" and that Ms. Miceli was at "high risk for injury R/T thoughts of suicide." There is no indication of any special precautions or measures to be taken relative to Ms. Miceli's obvious risk of harm relative to being placed in 5 point restraints given her underlying condition of asthma and history of panic attacks.

48.    At 00:15 (12:15 AM) defendant LPN S. Petite conducted a "Humane Restraint Medical Assessment" of Ms. Miceli. Ms. Miceli's vital signs were taken. Her appearance was noted as "quiet". There is no entry for "LOC". Comfort level is described "As expected" and complaints/problems as "none voiced". It is noted that there is a "deputy at tier". There is no indication that Ms. Miceli was still suicidal nor is there any information regarding any condition which would require continuation of the 5

25

point restraints. There is no indication of any effort made by defendant LPN Petite to determine whether Ms. Miceli could safely contract for release of restraints nor is there any indication of the consideration of any less restrictive measures. There is no referral for a medical or psychiatric evaluation to determine the appropriateness of the continuation of the restraints. Instead, defendant LPN Petite orders that the restraints are to be maintained "as previously ordered." At the time of this evaluation, Ms. Miceli had already been restrained for two (2) hours.

49.    During the time she was in restraints, Ms. Miceli was essentially held incommunicado.  There was no telephone in her cell and she had no access to a phone to make calls.  She was in the cell alone.  No medical or security personnel intervened with her in any meaningful or medically appropriate way to adequately assess her physical condition or mental status. Her prednisone medication had been taken away from her and on information and belief, she was denied access to an inhaler or other medical device to assist in her breathing.  She was given no medication for her anxiety or depression. She was even denied the ability to simply sit upright in a position to facilitate easier breathing. Instead, she was placed in a position, tied down, flat on her back, that, given her condition, the lack of appropriate medical care and supervision, presented an obvious risk of serious harm.

50.    Both defendant LPNs Hammond and Petite were on duty on HOD-10 during the entire time Ms. Miceli was being held in five point restraints, which totaled over 4 hours before she became "limp" and "unresponsive" and EMS was called. Both

defendant LPNs Hammond and Petite where aware of Ms. Miceli's history of asthma as well as her recent acute asthma history and her medications. Both defendant LPNs Hammond and Petite failed to provide adequate and necessary care for Ms. Miceli by, among other deficiencies, failing to adequately assess her mental or her medical status, failing to insure that she was seen by a psychiatrist or physician to evaluate her mental status, failing to insure that the orders restraining her where valid, appropriate and current, failing to insure that there was constant, medically appropriate observation of Ms. Miceli while in restraints and failing to properly or adequately check or monitor her safety and health. The conduct of defendant LPNs Hammond and Petite was in violation of the community standard of care. Defendant LPNs Hammond and Petite each knew, should have known or must have known of the serious risk of harm involved in placing an individual with Ms. Miceli's condition and history in five-point restraints, especially for such an extended period of time and especially given staffing and training problems at OPP and previous incidents and complaints involving injuries, suffering and death of inmates related to the use of restraints at OPP

51.    The OPCSO "Observation or Restraint Checklist" (hereafter "Restraint Checklist") indicates that defendant deputies Donald and J. Connor were responsible for observing and checking on Ms. Miceli while she was in restraints, under the supervision and direction of defendants Capt. Louque. As warden of the facility, defendant Major Jenkins also had supervision responsibilities relating to persons who were in restraints on HOD-10. Defendant deputies Donald and Conner's observations and documented

checks on Ms. Miceli's mental and physical condition were seriously inadequate. In addition, both deputies were inadequately trained and inadequately supervised to perform this critical function.

52.    The Restraint Checklist indicates that deputy checks of Ms. Miceli were to take place every 15 minutes, beginning at 2212 on Jan 4, 2009. The checklist has codes for entering on a blank space, next to pre-printed times, which improperly relieves the deputies from entering the exact time a check is made. The checklist for Ms. Miceli reflects that checks were made precisely every 15 minutes from 2215 until 0115 with the same entries: 9-11, which according to the form, reflect that Ms. Miceli was "Lying or Sitting" (code 9) and "Quiet" (code 11). There is no entry on the checklist showing that Ms. Miceli's restraints were ever loosened. There is also no entry reflecting that any medical checks were done or that the restraint checklist was reviewed by any medical personnel. The checklist fails to reflect which checks were made by defendant Donald and which were made by defendant Connor.  The checklist also fails to show any supervision or oversight of the deputies by any supervisors, including defendants Louque or Jenkins.

53.    At 1:15 AM after Ms. Miceli had been restrained for approximately three (3 hours), during which time she was described as "Lying or Sitting" and "Quiet", there is a marked change in her behavior. At 1:15 AM the Restraint Checklist reflects that Ms. Miceli is "Mumbling incoherently" (Code 7), "Lying or Sitting" (Code 9) and "Cursing" (Code 4). This same behavior is also noted at 1:30 AM. At 1:45 AM it is noted that Ms.

28

Miceli is "Crying" (Code 3), "Mumbling Incoherently" (Code 4) and "Lying or Sitting" (Code 9). At 2:00 AM, Ms. Miceli is noted to be "Lying or Sitting" (Code 9) and "Crying" (Code 3). At 2:15 AM she is noted to be "Yelling or Screaming" (Code 2), "Crying" (Code 3) and ""Lying or Sitting" (Code 9). At 2:30 AM Ms. Miceli is noted to be "Yelling or Screaming" (Code 2), "Lying or Sitting" (Code 9), "Cursing", (Code 4) and "Singing" (Code 5). The 2:30 AM entry is the last entry on the Restraint Checklist. There are no entries to provide any observations of Ms. Miceli's condition for the periods of time in between the 15 minute intervals.

54.     There is no narrative account of what Ms. Miceli is saying or the content of her speech during the time she is recorded by the defendant Deputies Donald and/or Connor as "mumbling incoherently, cursing, crying, yelling or screaming from 1:15 AM until 2:20 PM, a period of one hour and 15 minutes. The only reference to any content of Ms. Miceli's speech is a handwritten note in the section entitled "Deputy Notes" which states "INMATE ALLEGES SHES HAVING TROUBLE BREATHING ". This entry is made right before it is reported that Ms. Miceli was "also trying to get out of the restraints."

55.     Throughout this entire one hour and 15 minutes, there is no indication that defendant deputies ever requested or sought medical attention for Ms. Miceli nor is there any indication that Ms. Miceli ever received any medical attention or treatment. The last medical evaluation was conducted at 12:15 AM, approximately 1 hour before the change in Ms. Miceli's condition and mental status was noted and over 2 hours

29

before she was in extremis . Despite repeated notations of changes in her mental status during this hour and fifteen minutes, there was apparently no medical intervention sought or given to Ms. Miceli during this time.  Also throughout this time period, there is no record of any checking on Ms. Miceli by any of the medically trained defendants or any of the supervisor defendants.

56.    At 2:25 am defendant Deputy Donald requested that defendant Deputy Lennox relieve her watch for a restroom break.  Before taking the bathroom break, defendants deputies Donald and Lennox conducted a "security check", and  saw that Ms. Miceli had freed her left foot and left wrist from the restraints.  Defendant Deputy Lennox called for assistance from defendant Deputy Williams to place Ms. Miceli back in restraints.  Defendant Deputy Williams reports that when he arrived, Ms. Miceli was partially standing on the bunk, and "randomly screaming."  This behavior would indicate to a reasonable person that Ms. Miceli was experiencing acute distress, however, none of the defendant deputies attempted to determine the basis for the behavior or to note the content of Ms. Miceli's verbalizations, other than that she complained of difficulty breathing.  None of the defendant deputies called for medical assistance, despite the fact that they were aware that Ms. Miceli was complaining of having trouble breathing.

57.    Rather than call for medical assistance, defendant deputies Williams, Lennox, Connor and Donald, acting separately and together, physically held Ms. Miceli down and replaced the restraints.  As Ms. Miceli struggled to breathe, the deputies were holding her down and she "suddenly went limp."  Deputy Lennox called defendant Nurse

30

Petite, who was assigned to HOD-10. Nurse Petite arrived and called for medical

assistance and Captain Locque arrived at approximately 2:30 am.

58.    When defendant Nurses Petite and Hammond arrived, Ms. Miceli did not

have a pulse. They began CPR on Ms. Miceli and applied an Arterial External

Defibrillator (AED), but the AED did not recommend a shock. At 2:35, defendant Nurse

Oates arrived on the tier. At 2:40, defendant Nurses Townzel and Viverette arrived on

the tier while CPR was continued. On information and belief, no licensed medical

doctor was ever notified of the code, and no medical doctor arrived on the scene to

assist with resuscitation efforts. On information and belief defendants Townzel and

Viverette also had responsibilities to check on Ms. Miceli while she was restrained and

had failed to do so.

59.    Ms. Miceli still had no pulse or spontaneous respiration when the EMT

arrived at 2:55 AM, by which time Ms. Miceli had been without a pulse for approximately

twenty-five (25) minutes. The EMTs continued CPR and administered a series of

medications by I.V. At approximately 3:05, the EMTs detected a pulse and routed her

to University Hospital.

60.    Ms. Miceli arrived at University Hospital (hereafter "University") at

approximately 3:12 am on Monday, January 5, 2009. She was diagnosed with hypoxic

brain injury, post-code cerebral edema, metabolic acidosis, cardiac arrest and asthma.

In addition, University medical personnel noted that she had neck abrasions and

redness that doctors attributed to self-injury by hanging. Upon arrival at University, she

31

was placed on a ventilator and administered a range of code drugs to keep her heart

beating.  Her family, including her father and two sisters, were notified by the hospital

and arrived at the hospital in the afternoon on Tuesday, January 6, 2009.  The family

decided to remove Ms. Miceli from the ventilators and remained with her until she died

shortly after her removal from life support on January 6, 2009.

61.    After Ms. Miceli was taken to University, defendant Sheriff Marlin Gusman

contacted New Orleans Municipal Court Judge Sens around 1:00 pm on Monday,

January 5, 2009 and requested that Judge Sens release Ms. Miceli on her

recognizance.  Judge Sens did so at 1:37 pm that day.  As an elected official in Orleans

Parish, defendant Sheriff Gusman had the power to order Ms. Miceli's release on his

own authority, including at her initial appearance at the jail, yet did not do so. He also

had the authority to contact a judge to arrange for her release at the time of her initial

appearance at the jail or at any time during her stay at the jail, but failed to do so.

62. Prior to her death, Cayne Miceli endured significant pre-death suffering and

terror at the hands of the defendants.

63.    The defendants knew, must have known or should have known that OPP

has a history of serious injuries and deaths of prisoners due to the lack of adequate

medical and correctional care of prisoners involving restraints and suicides, including,

but not limited to the following, yet failed to take appropriate or necessary action in

response thereto:

               1.    On Nov. 29, 1996, Regie S. Hargrove, an inmate who was
                    supposedly being monitored for suicide, hung himself with a

bed sheet in a cell which was out of the line of vision of the nurses and deputies stations and which had numerous "anchor" or "tie-off" points.  Mr. Hargrove had also been the subject of improper use of restraints and inadequate monitoring and care while in restraints.

2.      On March 27, 1995, in the case entitled William P. DeMouy, Sr., v Foti, Docket No. 94-423, the prisoner survived but judgment was entered  against OPCSO then-Sheriff Charles C. Foti, Jr. and a deputy for improper monitoring and inadequate care of a suicidal prisoner placed in 5 point restraints on the psych floor of the OPCSO.

3.      On August 10, 2001, Shawn Duncan Sr., an arrestee charged with DWI, reckless driving and other traffic offenses, who was alleged to have suicidal/homicidal ideation, died of dehydration on HOD-10 after having been in 5 point restraints for 42 hours and given inadequate food, water and medical care to sustain life.

4.      On April 3, 2004, Matthew Bonnette, a young man who professed suicidal ideation was placed in four-point restraints and was also supposedly on suicide watch.  On April 4, 2004, while in four point restraints, Mr. Bonnette hung himself on HOD-10, using the 5 point restraint belt which had been left in his cell, after deputies failed to monitor him consistently.

5.      On August 29, 2007, Julio Sortes hanged himself with a telephone cord in his cell.  There is no evidence that he was ever referred for a psychiatric consult.  Nurses Petite, Oates, and Viverette were all involved in Mr. Sortes' care.

6.      On October 3, 2008, Louis Prince was found dead in his cell on HOD-10.  Mr. Prince had been arrested in New Orleans on September 26, 2008 and had been held on the sixth floor of HOD.  Mr. Prince did not receive any medication or a psychiatric evaluation until rank reported that he was behaving irate and talking to himself.  Dr. Higgins transferred Mr. Prince up to HOD-10.  Even after reports of escalating bizarre behavior, Mr. Prince was never placed on suicide

33

watch, and he ultimately hung himself in his cell on October 3, 2008.

64.    The deliberate indifference of defendants to the serious medical needs of prisoners at OPP is also reflected in the failure of defendants to provide adequate medical and correctional care of arrestees at intake, including inadequate screening, assessment, monitoring and treatment, including, but not limited to the following:

1.    Six days after Ms. Miceli's death, on January 12, 2009, John Sanchez was found dead in an isolation cell after being booked into the jail in an extremely intoxicated state. Despite the potential for fatal medical complications associated with alcohol withdrawal, Mr. Sanchez was inadequately monitored, diagnosed or treated.

2.    The following month, on February 6, 2009, Robert Rowzee was not adequately assessed when he entered the jail and was booked into the jail despite significant medical problems in part related to alcohol withdrawal. Deputies reported to the medical department that he was attempting to kill himself and was beating himself against the wall. By the time the medical department intervened, Mr. Rowzee had given himself a black eye. Ultimately, Mr. Rowzee was routed to University, where he died, because of potential brain injury and complications from delerium tremens.

65.    At the time of the death and ill-treatment of Cayne Miceli the defendants herein knew, should have known or must have known of continuing serious deficiencies in the policies, practices and procedures at the jail related to medical and psychiatric screening on intake and on HOD-10 for the treatment, care and observation of prisoners in restraints and those being monitored for suicide prevention. Defendants were also well aware of the inadequate staffing and inadequate training and supervision of staff with regard to medical and psychiatric problems of prisoners. Despite their knowledge

34

of these serious deficiencies, the defendants failed to take appropriate actions to make necessary changes to policies, procedures, training, supervision or staffing.

66.     Many of the defendants in the instant case, including defendants Drs. Gore, Higgins and Dileo, and Nurses Townzel, Viverette, Petite and Oates, have been involved in other incidents involving serious harm, injury or death to inmates in care of the OPCSO, yet neither they nor other responsible individuals were appropriately disciplined or held accountable for their actions with regard to those other injuries or deaths.  On information and belief, no OPCSO staff were disciplined or held accountable in any way for the treatment of Ms. Miceli as described herein.

67.     Defendant Gusman, Orleans Parish Criminal Sheriff, knew, should have known, or must have known of these serious deficiencies.  Despite this knowledge, he failed to take adequate steps to insure that appropriate and necessary changes in policies, procedures, staffing, training and/or facilities were made and implemented relating to suicidal prisoners and those in restraints on HOD-10 or regarding intake evaluations and treatment. He also failed to insure that appropriate disciplinary action was taken in situations where prisoners suffered or died as the result of inadequate care by OPCSO employees and staff.

68.     The supervisory and policy-making defendants knew, should have known, must have known of the dangers and obvious risk of harm of inadequate and improper monitoring and care of patients in restraints and on suicide precautions, yet failed to take appropriate and necessary steps to insure that reasonable and adequate care was

35

provided.  On information and belief, none of the individuals responsible for the care

and safety of Shawn Duncan, Regia Hargrove, William Demouy, Sr., Matthew Bonnette,

Louis Prince, Julio Sotres, Robert Rowzee or John Sanchez or any other patients at

OPCSO who were suicidal and in restraints and who received inadequate, improper or

harmful treatment, were disciplined or held accountable for their inadequate and

improper care and treatment of those individuals, or others similarly situated, thereby

condoning or ratifying their actions and also creating a custom and practice whereby

there was no accountability for mistreatment or violations of policies, procedures or

standards of care for suicidal and/or restrained patients.

69.    Additionally, through the monitoring and oversight of the psychiatric

department of the Orleans Parish jail from 1992 through 2008, by the federal court in

the proceedings entitled Hamilton v Morial, No. 69-2443, and other sources, the

defendants were aware prior to Cayne Miceli's death, that the physical facilities where

severely mentally ill and suicidal prisoners were being held, which includes HOD-10,

were extremely inadequate and potentially dangerous. They were aware that the cells

for confinement of inmates who were a suicide risk and the use of seclusion and

restraints did not meet acceptable standards.

70.    In addition, the defendants knew that the jail had inadequate staffing for

mental health and suicide prevention, including that on November 9, 2007, the National

Commission on Correctional Health Care (NCCHC) declined to accredit OPP.  In its

report, NCCHC partly based its decision on the fact that OPCSO was not compliant with

NCCHC's mental health and suicide prevention standards, noting in particular that there was only one psychiatrist on staff.

71.    On information and belief, there are many other instances of patients on HOD-10 who were placed in restraints for extended periods of time and/or who had suicidal/homicidal ideation, who were provided with inadequate medical care and monitoring by these defendants and other OPCSO staff, with little or no accountability or discipline being imposed.

72.    Additionally, defendants Gusman, Dr. Gore, Dr. Higgins, and Ms. Benitez knew, should have known, or must have known of the potential danger to suicidal patients such as Cayne Miceli being placed on HOD-10, but failed to take necessary or appropriate steps to insure that there was adequate staff coverage for the care of psychiatric patients, resulting in a number of patients, including Ms. Miceli, being inappropriately placed and/or left in restraints for extended periods of time, without appropriate medical or psychiatric evaluation or treatment or valid or current medical orders.

73.    Defendants Gusman, Dr. Gore, Dr. Higgins, and Benitez further knew, should have known, or must have known that the standard of care for suicidal patients could not be met by the policies, procedures, staffing or physical facilities of the OPCSO but failed to order or to take appropriate steps to see that Ms. Miceli or other prisoners in similar situations, were transferred and admitted to a hospital where they could

receive appropriate and adequate care in accordance with community standards of care.

74.     In addition, defendants knew, should have known, or must have known that the standard of care for patients experiencing acute asthma symptoms could not be met by the policies, procedures, staffing and physical facilities of the OPCSO, but failed to take adequate steps to ensure that patients like Ms. Miceli were transferred to hospitals equipped to handle asthma patients appropriately.

75.     Defendants Dr. Gore and Benitez as acting Directors of Nursing were the supervisors of Defendants Oates, Petite, Viverette, Townzel, and Polk and were responsible to properly train and supervise them and to insure that there was proper treatment and monitoring of prisoners, including Cayne Miceli, which both defendants failed to do.

76.     Defendants Gusman, Dr. Gore, and Dr. Higgins are responsible for the hiring, training, supervision and discipline of OPCSO medical personnel and are responsible for the policies, procedures and customs of the medical and psychiatric departments of the OPCSO and of those persons who work on HOD-10.  They are also responsible for medical training of correctional staff at HOD-10 along with defendant Benitez.  They failed to properly or adequately fulfill their responsibilities.

77.     Defendants Dr. Gore, Dr. Higgins, Dr. Dileo, and Benitez were all persons with the responsibility and duty for oversight, review, monitoring, supervision and evaluation of prisoners medical needs and the policies and procedures governing the

provision of adequate medical care.. On information and belief, these defendants were also responsible for the training and supervision of medical and correctional staff, which they failed to adequately perform. They, along with the defendant Sheriff, were also responsible for receiving and reviewing daily and regular reports regarding persons placed in restraints at the jail and of reviewing and correcting any improper, abusive or excessive use of restraints, which they failed to do. These defendants also had the responsibility to conduct thorough and reliable mortality reviews of all deaths of prisoners who were in custody of the OPCSO in order to take corrective action, as needed, to prevent further deaths, yet they failed to properly fulfill that duty.

78.    Defendants Warden Jenkins, Deputies Donald, Lennox, Connor and Williams are each persons who had the responsibility and duty to properly monitor Ms. Miceli while she was in restraints, and to communicate her medical needs to the appropriate medical staff for treatment. They were also responsible to insure that she was in a safe and secure environment. They each failed their responsibilities.

79.    The failure of defendants to provide and make available reasonable and adequate medical attention and treatment resulted in the death of Ms. Miceli.

80.    There was no reasonable justification, medical or otherwise, for the placement, extent, duration and manner in which Ms. Miceli was placed in five point restraints and deprived of appropriate treatment and comfort for her suicidal ideation, panic attacks and asthma. There was an obvious risk of harm in placing a person with the history and condition of Ms. Miceli in five point restraints for a period of many hours.

39

The risk of serious harm caused by tying her down, was obvious. This risk was greatly compounded by failing to properly monitor or evaluate her and withholding appropriated and necessary medical treatment from her.  The use of restraints in this manner constituted punishment, not treatment.  In addition, the actions of the defendant deputies Connor, Donald, and Williams, in ignoring Ms. Micelin cries and then physically holding Ms. Miceli down as she struggled to breathe, was deliberate and cruel and directly contributed to her suffering, pre-death terror and death.

81.     Defendants Sheriff Gusman, Dr. Gore, Dr. Higgins and Benitez knew, should have known, or must have known that the policies and procedures of the jail for providing medical services and treatment of psychiatric patients, including the frequency of the use, the methods and procedures for placing and monitoring of persons in restraints, and the length of time patients remained in restraints, were inadequate and posed a danger to the serious medical and psychiatric needs of prisoners so confined, yet they failed to take appropriate or necessary steps to correct them.

82.     The defendants Sheriff Gusman, Dr. Gore, Dr. Higgins, and Benitez knew, should have known, or must have known of the serious inadequacies of the policies, procedures, customs and practices at the OPCSO jail relating to prisoners who were suicidal, had the obligation and ability to correct these deficiencies but failed to do so.

83.     On information and belief, defendants Sheriff Gusman, Dr. Gore, Dr. Higgins, and Benitez participated, individually and collectively, in a "mortality review" of the circumstances of Ms. Miceli's death which sought to cover-up and hide the

40

deficiencies in the policies, customs and practices of the OPCSO and inadequate care and treatment provided to Ms. Miceli while she was in their custody and care, in order to excuse, condone, and ratify their own actions as well as that of their subordinates, and to avoid liability or responsibility for Ms Miceli's death.

84.     On information and belief, Defendant Gusman knew, should have known, or must have known that the supervisory and policy making defendants were providing false, incorrect and/or misleading information in order to obfuscate and avoid accountability for their actions and those of others involved in providing inadequate medical care to Ms. Miceli, as well as other prisoners, yet defendant Gusman failed to take any actions to uncover the true facts and instead excused, condoned and ratified their actions.

85.     The risk of serious harm and/or death to Ms. Miceli was known, must have been known or should have been known to the defendants, who failed to take appropriate and necessary measures to protect and preserve her life and safety, as set forth herein.

86.     The actions of the defendants, at all times pertinent herein, were under color of law and in the course and scope of their employment.

## VI. FIRST CAUSE OF ACTION

87.     Plaintiff repeats and re-alleges each and every allegation of the complaint.

88.     The defendants, acting individually and together, and under the color of law, engaged in a course of conduct and conspired to engage in a course of conduct

41

which acted to deprive Cayne Miceli of her constitutional rights and did deprive her of said rights, specifically, the right of Cayne Miceli to reasonable and adequate medical care, the right to be free from cruel and unusual punishment, the right to be free from unreasonable search and seizures, the right to liberty, i.e., to be free from bodily restraint, and the right to due process and equal protection of the laws as protected by the First, Fourth, and Fourteenth Amendments of the United States Constitution and 42 U.S.C. 1983.

89.    At all times pertinent herein the defendants, acting individually and collectively, acted unreasonably, recklessly and with deliberate indifference and disregard for the constitutional and civil rights and life and serious medical needs of the deceased, Cayne Miceli.

90.    The defendants' actions were reckless, willful, wanton and malicious.

91.    Defendants, individually and collectively, had the duty and ability to intervene to prevent the violations of the rights of Cayne Miceli, deceased, described herein, but failed to do so.

92.    Plaintiff further alleges that such acts as alleged herein were the proximate cause and cause in fact of the injuries sustained and the death of Cayne Miceli and the damages incurred thereby.

## VII. SECOND CAUSE OF ACTION

93.    Plaintiff repeats and re-alleges each and every allegation of the complaint.

42

94.    Defendants Sheriff Gusman, Dr. Gore, Dr. Higgins, and Benitez, acting individually and collectively, established, condoned, ratified and encouraged customs, policies, patterns and practices at the Orleans Parish Prison which directly and proximately caused the deprivation of the civil and constitutional rights of the deceased as alleged herein, and the injuries and damages as described herein in violation of the 1st, 4th and 14th Amendments to the U.S. Constitution and 42 USC 1983.

95.    These written and unwritten policies, customs and practices included, among others:

1.    Inadequate, improper and unreasonable screening, treatment, monitoring and supervision of the serious medical and psychiatric needs for persons in custody.

2.    Inadequate and unreasonable sick call, referral and followup procedures relative to the serious medical and psychiatric needs of persons in custody.

3.    Inadequate and unreasonable on-site medical and psychiatric staffing and coverage.

4.    Hiring of inadequately trained persons to render medical and psychiatric treatment to persons in custody.

5.    Inadequate training, supervision and discipline of medical personnel responsible for furnishing medical and psychiatric treatment and services to persons in custody.

6.      Inadequate hiring, training, supervision and discipline of deputies and supervisors responsible for the observation and monitoring of prisoners in restraints and the identification and communication of serious medical needs of persons in custody to appropriate medical personnel.

7.      A pattern and practice of deputies and medical personnel ignoring prisoners requests and needs for medical and/or psychiatric attention so that prisoners' serious medical and psychiatric needs were frequently ignored and, in those instances where medical and/or psychiatric treatment is ultimately obtained, it  is often unreasonably delayed and inadequate to the medical and psychiatric needs of the prisoners, causing serious pain, suffering, injury and/or death.

8.      Inadequate and unacceptable policies, procedures and practices relating to placing persons in restraints, including but not limited to the following:

        a. Failing to require that less restrictive alternatives other than restraints be seriously considered or utilized before resorting to the use of restraints, especially for prisoners who are suicidal.

        b. Failing to insure that restraints, once applied, are not used for any periods of time longer than are medically necessary or justifiable.

44

c. Failing to require regular and frequent re-assessment of restrained prisoners for use of less restrictive alternatives to restraints and for mental status.

d. Failing to require regular, frequent and documented evaluations of persons in restraints by nurses or qualified medically trained personnel which include but are not limited to conducting assessments as to providing release from restraints, checking for range of motion, releasing restraints to allow for exercise, personal hygiene and sanitary needs, toilet access, and other fundamental human needs.

e. Failing to require that restraint policies, procedures and practices in the jail comport with medically accepted standards in the community.

f. Inadequate training, supervision and discipline of deputies who are required to observe and monitor those in restraints and record their observations.

g. Failing to require adequate physical and mental evaluations of inmates to determine whether the use of restraints is medically appropriate.

h. Allowing persons to be held in restraints for unreasonable periods of time without requiring physical and psychiatric examination by a physician or psychiatrist.

i. Permitting and condoning violations by medical and security personnel of written policies and procedures regarding medical and psychiatric care of persons in restraints, resulting in significant discrepancies between written policies and procedures and actual practice and custom, with no meaningful discipline,

45

consequence or accountability for said violations or discrepancies, to the detriment of the health, safety and welfare of the prisoners in their care.

j.  Inadequate review or quality control of restraint orders and procedures to insure that they are being properly issued, applied and monitored.

k.  Inadequate record keeping of restraint observation sheets of individuals who are restrained, by failing to adequately train personnel who fill out these reports, failing to require detailed, content-based reporting, failing to make these reports an integral part of the individual's medical records, and failing to require or insure frequent, regular review of these documents by medically trained personnel, among other deficiencies.

l.  Failing to provide adequate staffing for monitoring, evaluating and treating prisoners in restraints.

m. Improper use of restraints as punishment and discipline.

n.  Allowing medical and security personnel to prepare inadequate progress notes and records regarding the condition of prisoners in restraints without appropriate discipline or accountability.

9.  Inadequate and unacceptable policies, procedures and practices relating to treatment, observation and monitoring persons who are suicidal or in need of medical care, including but not limited to the following:

46

a.    Accepting prisoners into OPCSO who are suicidal when the facility lacks appropriate and safe facilities, and has inadequate staff, policies and procedures for their care and safety.

b.    Accepting prisoners into OPCSO who have serious medical conditions, such as acute and chronic asthma symptoms when the facility lacked appropriate and safe facilities, and had inadequate staff, policies and procedures for their care and safety.

c.    Placing suicidal prisoners in restraints without attempting or considering less restrictive alternatives.

d.    Placing suicidal prisoners on HOD-10 and/or in restraints without requiring constant or one-on-one supervision.

e.    Allowing suicidal prisoners to be monitored at 15 minute intervals, which are wholly inadequate.

f.    Allowing, condoning, permitting and ratifying untrained and undisciplined correctional officers to do monitoring and observation of restrained and/or suicidal prisoners.

g.    Allowing, condoning, permitting and ratifying the practice of correctional officers of not filling out OPCSO Observation or Restraint Checklists contemporaneously with the observation.

h.    Failing to order the release of arrestees charged with municipal or traffic offenses only, not involving domestic violence, who have serious or potentially serious medical or psychiatric conditions for which the jail is unable to provide adequate medical or

47

psychiatric care.

10.    Inadequate, deficient or non-existent treatment plans for patients receiving psychiatric services.

11.    Inadequate quality control policies, procedures and practices, inadequate critical incident review, inadequate mortality reviews and inadequate identification and correction of serious deficiencies in policy and practices affecting the delivery and quality of medical and psychiatric services.

96.    In addition to the injuries sustained by Ms. Miceli, the deliberate indifference of defendants Gusman, Dr. Gore, Dr. Higgins, and Ms. Benitez, and their predecessors, to the serious medical and psychiatric needs of prisoners in the custody of OPCSO, has resulted in numerous instances of prisoners sustaining serious, and oftentimes fatal consequences, including injuries and suffering, including but not limited to those described herein.

97.    At all times pertinent herein the defendants acted unreasonably and with deliberate indifference and disregard for the constitutional and civil rights and life and safety of the deceased, Cayne Miceli. The actions of the defendants were malicious, willful, wanton and reckless.

98.    Plaintiff further alleges that such acts as alleged herein were the proximate cause and cause in fact of the injuries sustained, the death of Cayne Miceli

48

and the damages incurred.

## VIII. THIRD CAUSE OF ACTION

99.    Plaintiff repeats and re-alleges each and every allegation of the complaint.

100.    The pendant jurisdiction of the Court is invoked for all claims under state law.

101.    At all times described herein, the defendants, individually and collectively, acted negligently, with gross negligence and/or intentionally in denying reasonable and adequate  necessary medical care to Cayne Miceli, using unreasonable and unnecessary force, unlawfully restraining , committing battery, and in inflicting physical injury and severe emotional, mental and physical pain and suffering upon her, in violation of Louisiana constitutional and statutory law.

102.    The actions of the defendants caused the wrongful death of Cayne Miceli. At all pertinent times the defendant employees of the OPCSO were acting in the course and scope of their employment and the defendant sheriff Gusman in his official capacity is vicariously liable for the injuries sustained and damages incurred herein as a result of their actions.

103.    The defendants Dr. Gore, Dr. Higgins, Dr. Dileo, Polk, Oates, Petit, Viverette, Hammond, and Townzel each acted in derogation of their duties as medical professionals and their treatment of Cayne Miceli was beneath the medical standard of care in the community.

49

104.   The defendants, Sheriff Gusman, Dr. Gore, Dr. Higgins, Benitez, Dr. Dileo

Deputies Donald, Lennox, Williams, Black, Lawson, Captain Locque, Major Jenkins and

Nurses Oates, Petit, Viverette, Polk, Hammond and Townzel are liable for the wrongs

complained of herein by virtue of encouraging, aiding, abetting, counseling, ratifying and

condoning the commission of the afore described acts, by their failure to properly

administer, organize and staff the medical and correctional program at the jail and for

the failure to properly screen, hire, train, supervise and discipline persons under their

supervision and control whose acts and omissions contributed to the injuries sustained

and the death of Cayne Miceli.

105.   The defendants are liable individually and jointly for their actions

as alleged herein.

106.   Plaintiff further alleges that the above described actions were the

proximate cause and cause in fact of the injuries sustained herein.


## IX. **DAMAGES**

107.   As a result of the actions of the defendants as described above, damages

have been incurred as follows:

1.      Cayne Miceli (deceased) suffered conscious and severe
        physical, mental and emotional distress, pain and suffering
        and pre-death terror prior to her death and lost her life.

2.      Michael Miceli, the father of Cayne Miceli suffered emotional
        pain and suffering, past, present and future, and has
        suffered the loss of love, affection, and companionship of his
        daughter, Cayne Miceli.

50

3.        Funeral and burial expenses in excess of $5,000.00 were
         incurred.

## X.  PRAYER FOR RELIEF

WHEREFORE, plaintiff prays that after due proceedings there be judgment

rendered herein in plaintiff's favor and against all defendants individually and jointly,  as

follows:

1.        Compensatory and punitive damages as prayed for herein;

2.        Reasonable attorneys fees, all costs of these proceedings and legal
         interest;

3.        That this matter be tried by jury; and

4.        All other relief that this Honorable Court deems just and proper.

Respectfully submitted,

Mary E. Howell, LSBA #7030
Trial Attorney
316 S. Dorgenois Street
New Orleans, LA 70119
(504) 822-4455

Miceli.Complaint31Dec09meh